**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

PETER CORDEIRO                    :
                                  :
             Plaintiff,           :
                                  :
      v.                          :    C. A. No. 09-388-RGA-MPT
                                  :
MICHAEL J. ASTRUE                 :
COMMISSIONER OF                   :
SOCIAL SECURITY                   :
                                  :
             Defendant.           :

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

Plaintiff, Peter Cordeiro ("Cordeiro"), appeals from a decision of defendant

Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying

his application for a period of disability and disability insurance benefits ("DIB").[1]

Plaintiff Peter Cordeiro is the son of Thomas Cordeiro ("claimant").  Claimant applied for

disability and disability insurance benefits ("DIB"), and after his requests were denied,

he requested a hearing before an Administrative Law Judge ("ALJ").  Claimant died

before the hearing and Cordeiro pursued his father's application for DIB.

Claimant last met the insured status requirements of the Social Security Act on

March 31, 2005.  Through the date last insured ("DLI"), the claimant had the following

impairments:  benign prostate hyperplasia; high blood pressure; borderline intellectual

functioning and depression.  Following the DLI, the claimant also developed diabetes

---

[1] Under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.

mellitus and metastatic renal cancer.

Presently pending are cross-motions for summary judgment filed by Cordeiro and the Commissioner.  Cordeiro seeks a finding that claimant was under a disability and an award of DIB.  The Commissioner requests affirmance of his decision.  For the reasons set forth below, the Commissioner's motion is granted, and Cordeiro's motion is denied.


## II. BACKGROUND

### A. Procedural Background

On March 20, 2006, claimant filed an application for a period of disability and DIB, alleging disability began January 1, 2002 from depression and an enlarged prostate.  The claim was initially denied on September 13, 2006, and denied again upon reconsideration on December 22, 2006.  Claimant requested a hearing before an ALJ. Claimant died on January 28, 2007 prior to the hearing, and a request was granted naming his son, Cordeiro, as the substitute party.[2]

On April 29, 2008, ALJ Edward Banas presided over a hearing.  At the hearing, Cordeiro appeared and testified.  Additionally, a vocational expert ("VE") testified.  The ALJ found claimant was not under a disability at any time from the alleged onset date to the DLI.  The Appeal's Council denied Cordeiro's request for review.  Cordeiro then initiated this action, an appeal of the ALJ's decision under § 405(g) alleging: (1) the ALJ violated precedent in failing to call a medical expert witness at the hearing to infer an onset date;  and (2) the ALJ's hypothetical questions to the VE were incomplete.

---

[2] D.I. 82-84.

## 2. Factual Background

### A. Medical Evidence

At the time the ALJ issued his decision, claimant was deceased.  Claimant was forty-seven years old at the time of his disability onset and defined as a younger individual under 20 C.F.R. § 404.1563(c).[3]  Claimant had a seventh grade education and past work experience as a warehouse worker, a maintenance worker and a truck driver.[4]  The medical records of Middletown Family Care Associates from 1996 to 2006 indicate claimant suffered from benign prostatic hyperplasia ("BPH") and began complaining of frequent urination in 2000.[5]  Claimant was placed on Flomax to aid his prostate problem.[6]  The records indicate he complained of frequent urination in 2000 and 2001, but there is no further mention of the problem after 2003, although claimant was officially diagnosed with BPH in 2004.[7]  The medical records do not contain details about the frequency with which he used the restroom.[8]  The Middletown records also indicate claimant suffered from high blood pressure and in 2004 was placed on Cozaar, followed by Cardura, which improved his hypertension.[9]  Claimant was also diagnosed with depression in 1998.[10]  He continued to complain of depression until 2004.[11]  In

---

[3] D.I. 100.
[4] D.I. 51, 139.
[5] D.I. 180-194, 191.  Benign prostatic hyperplasia involves the enlargement of the prostate leading to decreased force of urination, dysuria and often frequent urination.  *See* D.I. 14.
[6] D.I. 225.
[7] D.I. 190-91, 180-89, 185.
[8] D.I. 180-94.
[9] D.I. 180-86.
[10] D.I. 193.
[11] D.I. 180-94, 224-77.

November 2004, claimant was placed on Zoloft and then Lexapro and indicated improvement with medication.[12]  In 2006, the records revealed no suicidal ideation, but he struggled with depression and was continued on Lexapro.[13]

In 2006 claimant's depression worsened, and he attempted suicide.  Middletown medical records show claimant began counseling and was placed on Cymbalta and Seroquel.[14]  Christiana Hospital medical records from the 2006 suicide attempt describe claimant as having a learning disability, previously undiagnosed severe attention deficit disorder, and depression for the past five years.[15]  The records also describe claimant as borderline intellectual functioning with a Global Assessment of Functioning ("GAF") of 20.[16]  In 2006, the consultative evaluation by Dr. Janis Chester from the Social Security Administration diagnosed claimant with depression and borderline intellectual functioning, with a GAF score of 40.[17]  Dr. Chester's records also note severe limitations on claimant's ability to perform work requiring frequent contact with others and perform complex tasks.[18]  Additionally, Dr. Chester found claimant had moderately severe limitations in his ability to relate to other people, perform daily activities and comprehend and follow instructions.[19]

---

[12] D.I. 185-88.

[13] D.I. 267-75.

[14] D.I. 177-79.

[15] D.I. 178.

[16] *Id.* The GAF is a scale ranging from zero to one hundred developed for use by mental health professionals as a means for expressing an adult's psychological, social and occupational functioning.  *See Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000).

[17] D.I. 195-201.

[18] *Id.*

[19] *Id.*

The medical evidence also establishes claimant developed insulin dependent diabetes mellitus in November 2006.[20]  In December 2006, he was diagnosed with metastatic renal cell cancer and died in January 2007.[21]

### B. Residual Functional Capacity Assessments and Case Analysis

A physical residual functional capacity evaluation ("RFC") was completed by Dr. Borek on September 6, 2006.  Relying on the medical evidence that preceded his DLI, Dr. Borek determined claimant could lift 50 pounds occasionally and 25 pounds frequently.[22]  He also found claimant could sit, stand and walk for up to 6 hours in an 8-hour day and should avoid concentrated exposures to temperature extremes, pulmonary irritants and hazards in the workplace.[23]  Both Dr. Borek and the State agency consultant, Dr. Acuna, completed case assessments of claimant which affirmed the RFC evaluation as to his physical impairments.[24]

The record does not contain opinion evidence regarding claimant's mental impairments prior to his DLI.[25]  State agency consultants, Drs. Pedro Ferreira and Christopher King completed case analyses evaluating claimant's depression and mental limitations for the period prior to his DLI.  Both concluded there was insufficient evidence to determine claimant's depression and mental impairments prior to his DLI.[26]

---

[20] D.I. 226-30.
[21] *Id.*
[22] D.I. 204-10.
[23] *Id.*
[24] D.I. 204-10, 222.
[25] D.I. 16. The record contains opinion evidence regarding claimant's mental impairments from Dr. Chester in August 2006, but it does not reflect the period before claimant's DLI.
[26] D.I. 211-21, 223.

### C. Adult Function Report, Activities of Daily Living Questionnaire and Pain Questionnaire

On April 29, 2006, claimant's brother completed on his behalf an Adult Function Report.  This report indicated, due to his depression, claimant's attention span was for two hours, and he often had difficulty completing tasks, could  pay attention for two hours at a time due to his depression, and often had problems completing tasks.[27]  The report also revealed claimant did not handle changes in routine or stress well.[28]

On April 29, 2006, claimant completed a Pain Questionnaire, wherein he noted daily pain in his shoulders, worsening in the evening and with movement.[29]  He described the pain as restricting his ability to do yard work and household repairs, which he treated with Tylenol.[30]

On July 25, 2006, claimant completed an Activities of Daily Living Questionnaire. On this form, he advised he could clean, cook, wash clothes, watch television, cut grass and do home repairs, and care for his personal needs.[31]  He noted his activities had become limited due to his depression and prostate condition.[32]  He listed working on cars as a hobby.[33]  He also reported no socialization with family or friends or membership with any clubs.[34]

### D. The Administrative Hearing

---

[27] D.I. 131-38.
[28] *Id.*
[29] D.I. 147-48.
[30] *Id.*
[31] D.I. 153-54.
[32] *Id.*
[33] *Id.*
[34] *Id.*

A hearing was held before the ALJ on April 29, 2008.  Cordeiro was represented by counsel and testified at the hearing.  In addition, a VE testified.

### 1. Cordeiro's testimony

At the hearing, Cordeiro testified living with his father since 1990, with whom he daily interacted.  He stated his father's last job involved loading and unloading trucks.  Cordeiro described his father as a hardworking person, who enjoyed working with cars and around the house.[35]  Cordeiro noted claimant had difficulty reading and writing, as well as socially interacting with other people.[36]

Cordeiro also testified his father was close to his mother (Cordeiro's grandmother) and struggled mentally and emotionally after her death.[37]  Cordeiro remembered claimant suffering from depression and suicidal thoughts since Cordeiro was a child.[38]  Cordeiro stated his father stopped working in 2001-2002 after struggling with frequent urination at work and continual depression.[39]  His father became very depressed after his mother's death, hardly left or cleaned the house and cried a lot.[40]  Cordeiro explained claimant's brother encouraged him to seek medical care, which claimant refused out of stubbornness, not from absence of pain.[41]  Cordeiro, however, also testified his father mowed the lawn and visited church friends and a woman who lived across the street.[42]

---

[35] D.I. 30-32.
[36] D.I. 33-36.
[37] D.I. 34.
[38] *Id.*
[39] D.I. 37-44.
[40] D.I. 41-44.
[41] D.I. 39.
[42] D.I. 45-50.

## 2. Vocational expert's testimony

Following Cordeiro's testimony, the ALJ consulted a VE, Tony Melanson. Melanson described claimant's education as limited and classified his past work as a warehouse worker as heavy and unskilled, and his work as a maintenance worker and truck driver as medium and semi-skilled.[43]  Melanson testified frequent urination could result in termination from those positions because of its impact on productivity.[44]  He also confirmed chronic, severe depression would prevent an individual from performing any substantial gainful activity, and mild depression would prevent performance of skilled work, but not semi-skilled work.[45]

The ALJ asked the VE to consider a hypothetical person who was younger, had a limited education and work history similar to claimant, as well as the symptoms described by Cordeiro.[46]  The VE explained this hypothetical individual was incapable of doing any jobs.[47]  The ALJ then posed an alternate hypothetical where an individual would be capable of work activity at a light level of exertion, but would not require interaction with the public.[48]  The VE testified this person could perform work, such as a mail clerk, which does not require substantial reading or writing.[49]  The VE was also asked if a person with Dr. Chester's diagnosis would be able to work; the VE concluded

---

[43] D.I. 50-51; *See* 20 C.F.R. § 404.1564(b)(3) (stating limited education refers to individual with a seventh through eleventh grade level of formal education).
[44] D.I. 51-52.
[45] D.I. 51.
[46] D.I. 52-53.
[47] D.I. 52.
[48] D.I. 53.
[49] *Id.*

he would not.[50]

## C. The ALJ's Findings

On May 21, 2008, the ALJ issued the following findings:[51]

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2005.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2002 through his date last insured of March 31, 2005. (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: benign prostatic hyperplasia; high blood pressure; borderline intellectual functioning and depression. (20 C.F.R. 404.1520).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except that he would have needed to avoid concentrated exposure to extremes in temperature, pulmonary irritants and hazards in the work place; would have been limited to simple, routine work and would have been limited to jobs not requiring a lot of interaction with the public.

6.  Through the date last insured, the claimant was unable to perform past relevant work. (20 C.F.R. 404.1565).

---

[50] D.I. 54-55.  Dr. Chester's records note severe limitations on claimant's ability to perform work requiring frequent contact with others and perform complex tasks. Claimant had moderately severe limitations relating to others, performing daily activities and comprehending and following instructions.

[51] The ALJ's factual findings are extracted from his decision.

7.      The claimant was born on January 13, 1954 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged onset date. (20 C.F.R. 404.1563).

8.      The claimant has a limited education and is able to communicate in English. (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. (20 C.F.R. 404.1560(c) and 404.1566).

11.     The claimant was not under a disability as defined in the Social Security Act, at any time from January 1, 2002, the alleged onset date, through March 31, 2005 the date last insured. (20 C.F.R. 404.1520(g)).

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[52]  If the court determines there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is

---

[52] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

appropriate.[53]

### B. Review of ALJ's Findings

A court must uphold the Commissioner's factual decisions if they are supported

by "substantial evidence".[54]  Substantial evidence does not mean a large or a

considerable amount of evidence.[55]  Rather, it has been defined as "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate."[56]

Credibility determinations are the province of the ALJ, and should be disturbed

on review only if they are not supported by substantial evidence.[57]  Thus, the inquiry is

not whether the court would have made the same determination, but rather, whether the

Commissioner's conclusion was reasonable.[58]  In social security cases, this substantial

evidence standard applies to motions for summary judgment pursuant to FED. R. CIV. P.

56(c).[59]

## IV. POSITIONS OF THE PARTIES

Cordeiro argues his motion should be granted because (1) the ALJ violated

precedent by failing to call a medical expert witness, and (2) the ALJ's hypothetical

---

[53] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[54] *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

[55] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[56] *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[57] *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)).

[58] *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

[59] *See Woody v. Sec. of the Dep't of Health and Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

question to the VE wrongly identified claimant as having a "limited education" when he had only a "marginal education."[60]

Cordeiro argues the Third Circuit, most notably in *Walton v. Halter*, held an ALJ should call a medical expert witness in cases involving a remote onset date, a chronic mental condition and a lack of medical records for the most relevant period.[61] Specifically, Cordeiro argues the three reasons for ordering a medical expert in *Walton* are present here.[62]   Additionally, Cordeiro disputes the Commissioner's argument that medical expert testimony is required only when a finding of disability has already been made, arguing this was not the situation in *Walton*.  Cordeiro maintains the failure to call a medical expert prevents a "legitimate medical basis" for the ALJ's conclusion on disability.[63]  Finally, Cordeiro argues the ALJ's finding that claimant was not disabled prior to the date last insured is contrary to the available medical evidence, relying on claimant's suicide attempt and several physicians diagnoses of claimant's severe and ongoing depression for over five years.

Cordeiro also alleges the hypotheticals to the VE did not accurately portray claimant's vocational factors.  Specifically, the questions posed assumed an individual with a limited education, while claimant more accurately had a marginal education.

---

[60] *Compare* 20 C.F.R. § 404.1564(b)(3) (stating limited education refers to individual with a seventh through eleventh grade level of formal education), *with* 20 C.F.R § 404.1564(b)(2) (providing marginal education refers to individual with below a limited education).
[61] *Walton v. Halter*, 243 F.3d 703, 708 (3d Cir. 2001).
[62] *Id.*
[63] *Id.* (holding ALJ's onset date must have legitimate medical basis).

Cordeiro argues this inaccuracy requires remand.[64]  Cordeiro contends a job claimant was found capable of performing is actually semi-skilled, a level claimant could not perform.  Cordeiro also maintains the ALJ acknowledged claimant was barely literate and the jobs identified by the VE are beyond the range of such an individual.

The Commissioner argues substantial evidence supports the ALJ's decision.[65]  In applying the five step evaluation process to determine whether claimant was disabled, the Commissioner maintains the evidence clearly demonstrates jobs claimant could perform.[66]  Commissioner also argues the ALJ was not required to obtain medical expert testimony, distinguishing *Walton* from the present matter, since claimant's alleged onset date was relatively recent, the ALJ possessed adequate medical records, and the medical evidence establishes claimant's depression became severe only after his DLI.

The Commissioner also alleges that Cordeiro's argument about claimant's marginal education versus limited education is without support, because claimant's completed grade level governs and the contrary medical report, on which Cordeiro relies on, is irrelevant.  Finally, the Commissioner acknowledges the mail sorter/inspector job is semi-skilled, but argues the ALJ had a reasonable basis for determining that claimant, with mild to moderate depression, could perform such work.  The Commissioner disputes the ALJ accepted claimant was barely literate, and asserts

---

[64] *See Ramirez v. Barnhardt*, 372 F.3d 546, 552-554 (3d Cir. 2004) (holding inaccurate and incomplete hypotheticals require remand); *Burns*, 312 F.3d 113, 123 (3d Cir. 2002); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984); *Wallace v. Sec'y of Health and Human Serv.*, 722 F.2d 1150, 1155 (3d Cir. 1983).
[65] *See* 42 U.S.C. §§ 405(g), 1383(c)(3).
[66] *See* 20 C.F.R. § 404.1520(g).

13

the evidence does not indicate claimant could not perform different semi-skilled employment.

## V. ANALYSIS

### A. Disability Determination Process

**Disability Determination Standard**

To be eligible for DIB, claimant must show he has a medically determinable impairment, so severe that it prevents him from performing any substantial gainful activity existing in the national economy.[67]  "The physical or mental impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[68] Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[69]

**Five Step Test**

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[70]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.

---

[67] See 42 U.S.C. § 423(d)(1)(A), (d)(2)(A); 20 C.F.R. § 404.1505(a); *Heckler v. Campbell*, 461 U.S. 458, 459-60 (1983).

[68] *See* 42 U.S.C. § 423(d)(2)(A).

[69] *See* 42 U.S.C. § 423(d)(3).

[70] *See* 20 C.F.R. § 404.1520(a); *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.  In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.   The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at the fifth step.[71]

If the ALJ determines a claimant is disabled at any step in the sequence, the analysis stops.[72]

**Weight Given to Treating Physicians**

"A cardinal principle guiding disability eligibility determinations is that the ALJ accords treating physicians' reports great weight."[73]  Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record.[74]

---

[71] *Plummer*, 186 F.3d at 427.
[72] *See* 20 C.F.R. § 404.1520(a).
[73] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).
[74] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

15

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[75] If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[76]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is a finding dispositive of the case.[77] Therefore, only the ALJ can make a disability determination.

### Factors in Evaluating Credibility[78]

A claimant's statements and reports from medical sources and other persons along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility. Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations. Therefore, the adjudicator should review and consider any available objective medical evidence concerning the claimant's symptoms in evaluating the claimant's statements. An

---

[75] *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[76] *Plummer*, 186 F.3d at 429.
[77] *See* 20 C.F.R. § 416.927(e)(1).
[78] *See* SSR 96-7p.

applicant's claims may be less credible if the level of frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis.  Such opinions are not given controlling weight.  However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability.  The ALJ must apply his finding on credibility in step two of the five-step disability process, and may use it at each subsequent step.

The decision must clearly explain - provide sufficiently specific reasons based on the record - to the claimant and any subsequent reviewers, the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes the claimant's work history should be considered when evaluating the credibility of his testimony or statements.[79]  A claimant's testimony is accorded substantial credibility when he has a long work history, if it is unlikely that, absent disability, he would have ended employment.[80]

**Medical Expert Testimony**

---

[79] See 20 C.F.R. § 404.1529(a)(3).
[80] See Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984) (citing Tayborn v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981)).

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[81]  "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset date must be inferred."[82]

## B. Whether the ALJ's Decision Is Supported by Substantial Evidence

Cordeiro asks the court to acknowledge claimant's depression and borderline intellectual functioning were disabling, and he did not posses the residual functional capacity to perform medium work, qualifying him for DIB.[83]  In addition to proving disability, a claimant must establish disability on or before the DLI to be entitled to a period of disability and disability insurance payments.[84]  Here, claimant's DLI is March 31, 2005, and his onset date is January 1, 2002.[85]  Thus, claimant must demonstrate he was disabled after his onset date and prior to March 31, 2005 to be eligible for DIB.

The objective medical evidence is insufficient to support a finding that claimant's depression and mental impairments were disabling prior to his DLI.  The records indicate claimant was diagnosed with and suffered from depression beginning in 1998.  The ALJ noted claimant's treating physicians at Middletown Family Care Associates characterized his depression as mild to moderate and prescribed medication.  The ALJ also noted in 2004 claimant represented to his physician that the drug, Lexapro,

---

[81] *See* SSR 83-20.

[82] *Id.*

[83] Cordeiro does not allege any of claimant's physical impairments were severely disabling prior to the DLI (i.e., blood pressure, benign prostatic hyperplasia);  instead, he focuses on claimant's depression and borderline intellectual functioning.

[84] *See* 20 C.F.R. § 404.131 (stating "to establish a period of disability, you must have disability insured status in the quarter in which you become disabled.").

[85] *See* D.I. 12.

improved his depression. The ALJ further determined claimant's depression and mental impairments did not meet or medically equal the criteria of listings in 20 C.F.R. 404.1520(d), 404.1525 and 404.1526.

In making his determination, the ALJ thoroughly analyzed the evidence and set forth his reasons for accepting or rejecting the opinions of the physicians. In making a disability determination, the ALJ "may reject the opinion of a treating physician if the opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record."[86] The ALJ must adequately explain any reasons for rejecting a treating physician's opinion, and when doing so, must consider factors such as "length of the treatment relationship, nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, and specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion."[87] The Third Circuit has explained although an ALJ is not permitted to reject an examining physician's conclusions on credibility alone, he "may afford a treating physician's opinion more or less weight depending on the extent to which the supporting explanations are provided."[88]

In the present matter, the ALJ reviewed claimant's medical history and symptoms and determined he had the severe impairments of borderline intellectual functioning and

---

[86] *Sanchez v. Barnhart*, 388 F. Supp. 2d 405, 411 (D.Del. 2005) (citing *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001)).

[87] *Id.* at 411-12 (citing 20 C.F.R. § 404.1527(d)(2)-(6)).

[88] *Morales v. Apfel*, 22 F.3d 310, 318 (3d Cir. 2000); *Plummer*, 186 F.3d at 429.

depression.[89]  Nonetheless, the ALJ found the combination of impairments did not meet

or medically equal one of the listed impairments and the claimant had the residual

functional capacity to perform medium work.[90]  The ALJ's decision listed specific

instances where both claimant's doctors or his own statements support this

determination.[91]  The ALJ did not discredit doctors' opinions.  Instead, he accorded more

weight to the conclusions that were supported by the medical evidence available, and

less weight to those that were contradicted or unsupported by the objective medical

records.[92]  The ALJ provided explanations and references to the medical records in each

instance that Dr. Chester's opinions or Cordeiro's testimony were given less weight.[93]

When substantial evidence supports the ALJ's findings of fact, they are

considered conclusive.[94]  The ALJ noted the medical record does not support Cordeiro's

contention that claimant was disabled prior to his DLI by depression or by borderline

intellectual functioning.  While medical records indicate claimant suffered from

depression and was placed on anti-depressants, the claimant advised these

medications worked well for him throughout 2004 and 2005.[95]  During this period, his

doctors did not encourage claimant to seek counseling, and claimant was not admitted

to a mental health facility.  The medical records indicate claimant's major problems with

depression began in April 2006, after claimant's DLI.  Claimant's comments from 2006

---

[89] D.I. 14-15.
[90] D.I. 15-17.
[91] D.I. 15-21.
[92] D.I. 17-21.
[93] D.I. 16, 17, 19, 21.
[94] *Id.*
[95] *See* D.I. 185.

and testimony from his son suggest he was severely depressed and suicidal for the preceding two years, but such comments are not supported by the objective medical evidence.  Rather, for the two years prior to his DLI, there is no medical evidence demonstrating that claimant's depression was severely disabling.[96]

Similarly, there is no medical evidence regarding claimant's mental impairments prior to the DLI.  The medical evidence from Dr. Chester in 2006, which indicated claimant had severe mental impairments, is not instructive for the period prior to claimant's DLI.  Severe limitations may have existed at the time Dr. Chester examined claimant, but this examination occurred sixteen months after the DLI.  The medical records from the relevant period support that claimant would be limited to simple routine work as a result of his depression and his borderline intellectual functioning.  The ALJ correctly placed limits on claimant's residual functional capacity, and determined there were jobs that existed in the national economy that claimant could perform.  The ALJ's "decision must explain the consideration given" to the analysis of the treating physicians.[97]  Here, the ALJ properly weighed the treating doctors' opinions and statements from claimant and provided the bases for his determination as required under 20 C.F.R. § 404.1527.  His determinations are supported by substantial evidence as contained in the record.

**B. Medical Expert Witness**

Cordeiro contends the ALJ's decision is not supported by substantial evidence. Specifically, Cordeiro argues the ALJ erred in not having a medical expert witness at the

---

[96] *See* D.I. 19.
[97] SSR 96-5P.

hearing.  Cordeiro points to the holding in *Walton v. Haller* which requires a medical

expert in cases where the claimant has a slowly progressive impairment, and there is a

remote onset date and a lack of medical records.[98]  In *Walton*, the court explained a

medical expert witness is necessary where there is difficulty in ascertaining onset dates

because of slowly progressive impairments.[99]  In requiring the medical expert witness,

the *Walton* court also held "the established onset date must be fixed on facts and can

never be inconsistent with the medical evidence of record."[100]

    Subsequent cases have limited *Walton* to "situations where the underlying

disease is progressive and difficult to diagnose, where the alleged onset date is far in

the past, and where medical records are sparse or conflicting."[101]  Additionally, the Third

Circuit requires medical expert witnesses only where medical evidence from the

disputed period is entirely lacking.[102]  It has also refused to require medical expert

witnesses where the medical evidence available supported the ALJ's conclusion

regarding the onset date.[103]

    The holding in *Walton* requiring a medical expert witness is not applicable to this

---

[98] *Walton v. Halter*, 243 F.3d 703, 708 (3d Cir. 2001); *see also* SSR 83-20.

[99] *Id.*

[100] *Id.*

[101] *See Wilson v. Astrue*, No. 10-4517, 2011 WL2036673, at *5 (E.D. Pa. 2011) *(quoting Bailey v. Comm'r of Soc. Sec.*, 354 Fed. App'x. 613, 618 (3d Cir. 2009) (limiting Walton's holding to progressive diseases, with onset dates far in the past and limited medical reports)).

[102] *See Klangwald v. Comm'r of Soc. Sec.*, 269 Fed. App'x. 202, 205 (3d Cir. 2009) (requiring medical expert witness where medical records were completely unavailable).

[103] *See Kirk v. Comm'r of Soc. Sec*, 177 Fed. App'x. 205, 208-09 (3d Cir. 2006) (allowing ALJ to refuse medical expert witness where medical records supported ALJ's onset date).

matter.  First, claimant did not suffer from a slowly progressive impairment.  The objective medical records do not evidence a disabling depression prior to 2006. Instead, they indicate claimant received treatment for his depression and was responding positively.  Although claimant had severe depression after his DLI in 2006, circumstances specific to that time prompted this onset, and no evidence of severely disabling depression is referenced during prior years.  In *Walton,* the requirement of a medical expert witness was due to concern over ascertaining the correct onset date for a claimant with a slowly progressive impairment.  Here, claimant's depression was not a slowly progressive impairment;  thus, the case is not analogous to *Walton*.

Second, unlike *Walton*, claimant's onset date was not far in the past.  Rather, claimant was first diagnosed with depression only three years prior to his DLI.  *Walton* and subsequent cases have limited the requirement of medical expert witnesses to situations where the onset date was in the distant past.  Here, claimant's onset of depression was recent, and the medical records indicate he responded to treatment.

Finally, unlike *Walton*, there is no absence of or discrepancy in the medical records.  The medical evidence shows claimant was medicated for mild depression prior to 2006.  During this period, no counseling or commitment to a psychiatric facility was recommended, and the medications were working for him.[104]  Thus, the circumstances in *Walton* are not present in the instant matter, and the ALJ was not required to have a medical expert witness at the hearing.

## C. Vocational Expert Testimony

---

[104] *See* D.I. 260.

Cordeiro also contends the ALJ erred in the hypothetical question by having the VE assume an individual with limited education.  Instead, Cordeiro maintains the hypothetical question should have assumed an individual with marginal education. Relying on the report from Dr. Chester, Cordeiro argues since claimant left school before completing the seventh grade, he did not receive a limited education, but only completed a marginal education.[105]

Credibility determinations are the province of the ALJ, and only should be disturbed on review if not supported by substantial evidence.[106]  In his disability application, claimant stated he completed the seventh grade, and physician reports describe claimant as leaving school "after seventh grade."[107]  Although, Dr. Chester describes claimant as leaving school in the seventh grade, the ALJ was entitled to rely on other evidence in the record, including claimant's representation on his disability application.  Therefore, there is substantial evidence for concluding that claimant completed the seventh grade, and the hypothetical question to the VE assuming an individual with limited education was not improper.

Cordeiro also contends the VE misidentified the mail sorter/inspector job as semi-skilled and claimant could not have performed this job.  Cordeiro argues claimant could not perform semi-skilled work because he had not previously acquired the skills necessary to transfer to that job.  However, the VE never identified the sorter/inspector job as semi-skilled.  He explained an individual with mild to moderate depression would

---

[105] *See* D.I. 196.
[106] *See* 20 C.F.R. § 404.1527(e); *see also Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983).
[107] See D.I. 129, 177-78, 257-58.

be capable of performing semi-skilled work.  As cited by the ALJ, Medical-Vocational

Rule 203.26 supports a finding that claimant is not disabled, whether or not claimant

has transferable job skills.  As a result, the classification of the sorter/inspector job as

semi-skilled is correct, and the sorter/inspector job is not precluded based on

transferability.

Finally, Cordeiro contends the ALJ accepted claimant was barely literate and the

identified jobs could not be performed by an individual who was barely literate.

However, the ALJ did not conclude claimant was barely literate;  rather, he noted

"medical records from Christiana Hospital and a consultative evaluation with [Dr.]

Chester, show that the claimant [. . .] is barely literate."[108]  In addition, the ALJ

recognized claimant's borderline intellectual functioning as a severe impairment.  The

VE testified claimant's past work was semi-skilled and would not have required a lot of

writing and reading.  In recommending the sorter/inspector job, the VE specifically noted

this job did not involve significant writing and reading.

In making his determination, the ALJ thoroughly analyzed the records and

recognized claimant's borderline intellectual functioning and his past work performing

semi-skilled jobs.  There is no evidence demonstrating claimant's ability to perform past

work or his intellectual functioning diminished after his onset date.  Nor was there a

finding by the ALJ that the claimant was barely literate.  Therefore, claimant's ability to

perform the sorter/inspector job is not foreclosed by the ALJ's findings or other evidence

regarding his mental impairments.

---

[108] D.I. 15.

## III. ORDER AND RECOMMENDED DISPOSITION

For the reasons stated herein, this Court recommends that:

(1) Plaintiff's motion for summary judgment (D.I. 12) be denied, and (2) Defendant's motion for summary judgment (D.I. 16) be granted.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  The objections and response to the objections are limited to ten (10) pages each.

The parties are directed to the Court's standing Order in Non Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov.


Date:  June 6, 2012                                  /s/ Mary Pat Thynge
                                                     United States Magistrate Judge
                                                     _____